UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MAURICE PULLUM,

                                    Plaintiff,

         v.

MICHAEL ASTRUE, Commissioner of
  Social Security Administration,

                                    Defendant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**07-CV-00397A(F)**

APPEARANCES:          NEIGHBORHOOD LEGAL SERVICES, INC.
                      Attorneys for Plaintiff
                      ALAN B. BLOCK, of Counsel
                      Main-Seneca Building
                      237 Main Street
                      Suite 400
                      Buffalo, New York  14203

                      KATHLEEN M. MEHLTRETTER
                      Acting United States Attorney
                      Attorney for Defendant
                      JANE B. WOLFF
                      Assistant United States Attorney, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York  14202

## <u>JURISDICTION</u>

         This action was referred to the undersigned by Honorable Richard J. Arcara, on

October 26, 2007, for pretrial matters, including report and recommendation on

dispositive motions.  The matter is presently before the court on Defendant's motion

(Doc. No. 8), for judgment on the pleadings, filed January 4, 2008.

## BACKGROUND

Plaintiff, Maurice Pullum ("Plaintiff"), seeks review of Defendant's decision terminating his eligibility for Supplemental Security Income ("SSI") benefits ("disability benefits") under Title XVI of the Social Security Act ("the Act"). In terminating Plaintiff's eligibility for disability benefits, Defendant determined that although Plaintiff has not engaged in substantial gainful activity since November 3, 1989, the date Plaintiff was initially found disabled, and suffers from the severe conditions of borderline intellectual functioning and a seizure disorder in remission, as of July 1, 2003, Plaintiff's disability had ceased based on medical improvement of the seizure disorder such that Plaintiff no longer has an impairment or a combination of impairments within the Act's definition of impairment. (R. 25-26).[1] Plaintiff's last disability benefits payment was to be September 2003, although Plaintiff requested continuation of his benefits pending the outcome of Plaintiff's appeal of the decision terminating his benefits, resulting in a continuation of Plaintiff's benefits. (R. 34, 37-38, 385).

## PROCEDURAL HISTORY

On November 3, 1989, Plaintiff was initially awarded SSI benefits based on the SSA's finding that Plaintiff was, as of April 29, 1988, disabled by a seizure disorder and impaired brain function. (R. 15, 57). Plaintiff continued to receive disability benefits based on his seizure disorder and impaired brain function until September 2003 when his disability benefits were terminated because the SSA had determined that Plaintiff's

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

condition had improved and was no longer disabling.  (R. 29-30, 33-36).

On October 2, 2003, Plaintiff filed a request for reconsideration of the SSA's determination the Plaintiff was no longer disabled.  (R. 39-40).  On May 13, 2004, a hearing was held before an SSA Disability Hearing Officer who, on July 26, 2004, denied Plaintiff's reconsideration request.  (R. 32, 43-69).

On July 30, 2004, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (R. 72-73), and, on November 1, 2005, a hearing was held before ALJ Robert T. Harvey.  (R. 373-414).  Plaintiff, represented by Alan B. Block, Esq. ("Block"), appeared and testified at the hearing.  (R. 373, 375).  No other witnesses testified at the hearing.  (R. 373-414, *passim*).  On February 14, 2006, the ALJ issued his decision, finding that Plaintiff's disability had ceased in July 2003, based on medical improvement related to Plaintiff's ability to work.  (R. 12-27).  On April 25, 2007, the Appeals Council denied Plaintiff's request for further review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (R. 6-9).  Plaintiff commenced the instant action on June 21, 2007.

Defendant's answer to the Complaint was filed October 25, 2007 (Doc. No. 5), accompanied by the record of administrative proceedings.  On January 4, 2008, Defendant filed a motion for judgment on the pleadings (Doc. No. 8) ("Defendant's motion"), supported by a Memorandum of Law (Doc. No. 9) ("Defendant's Memorandum").  Plaintiff filed eight motions seeking to extend the deadline for filing a response to Defendant's motion because of a need to complete discovery.  (Doc. Nos. 10, 12, 14, 16, 18, 20, 22 and 24).  On August 28, 2009, Plaintiff filed in opposition to Defendant's motion a Memorandum of Law (Doc. No. 26) ("Plaintiff's Memorandum").

In further support of Defendant's motion, Defendant filed on October 2, 2009, a Memorandum of Law (Doc. No. 28) ("Defendant's Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DENIED, and the matter should be REMANDED for further proceedings consistent with this Report and Recommendation.

## FACTS[2]

Plaintiff, born on February 19, 1951, (R. 376), was 52 years old when his disability benefits were terminated in July 2003. (R. 25). Prior to November 3, 1989, when Plaintiff was initially found eligible for disability benefits ("the CPD"),[3] Plaintiff had completed high school, two years of college, and earned a certificate as a medical assistant. (R. 377). Plaintiff has not worked on a regular basis since the mid 1970s, and has not worked at all since 1989. (R. 104, 283). Plaintiff's decreased working capacity is attributed to a closed head injury - a brain bleed - he sustained in the 1970s, which caused a grand mal seizure disorder with generalized convulsions, and impaired brain functioning. (R. 59, 283, 303, 362, 363).

In 1988, Dr. Galeota, Plaintiff's then treating physician, stated Plaintiff has "a

---

[2] Plaintiff concedes that his seizure disorder is well-controlled with medication, and does not rely on his back disorder to establish disability but, rather, solely on his impaired brain function as establishing that Plaintiff, despite having completed two years of college, functions at the eighth grade level. Plaintiff's Memorandum at 9-10. As such, only the facts relevant to Plaintiff's impaired brain function are discussed in detail.

[3] The SSA refers to the date of the most recent prior favorable medical decision that the claimant is disabled or continues to be disabled as the "comparison point decision" or the "CPD". (R. 65).

grand mal seizure disorder with generalized convulsion secondary to an old head injury." (R. 59). A CT scan of Plaintiff's head, taken in September 1988 "revealed a large area of atrophy in the right temporal frontal region." (R. 59). In 1988, intelligence quota ("IQ") testing yielded scores of 79 (verbal), 88 (performance) and 81 (full scale). (R. 59, 164, 216). Psychological evaluations showing a relative limitation on verbal and verbal sequencing capacities, resulted in an impression of mild to moderate organicity,[4] with behavioral evidence of "frontal lobe syndrome" in which Plaintiff "relies inordinately upon others for directions and responds to situations in a slow and bland manner." (R. 59). Plaintiff was initially awarded disability benefits on November 3, 1989, based on a seizure disorder and impaired brain functioning. (R. 15, 57). Plaintiff experienced no seizures between October 1999 and March 2005. (R. 303).

In connection with a routine periodic review of Plaintiff's disability benefits case, as required under the Act, Plaintiff completed a Report of Continuing Disability Interview (R. 106-15), in which Plaintiff stated that his disabling condition consisted of "seizures; caused by police brutality." (R. 106). Plaintiff also indicated that his disabling condition had improved insofar as he no longer had seizures when he took his medication, that he had no new injuries or illnesses. *Id*. Plaintiff, because of the medication he took, did not feel he could return to work, nor had Plaintiff's physician told Plaintiff he could return to work. (R. 106, 111). Plaintiff listed his treating physicians as neurologist Insook Shin ("Dr. Shin"), Dr. Margaret Paroski ("Dr. Paroski"), and Dr. Pamela Reed ("Dr. Reed").

---

[4] "Organicity" or "organic brain syndrome" refers to decreased mental functioning that is not part of the normal aging process, resulting from a disease, including a disturbance of the structure or function of the brain caused by trauma, rather than from a psychiatric disorder. *See* Organic Brain Syndrome, *available at* http://www.thefreedictionary.com/organic+brain+syndrome, and http://www.nlm.nih.gov/medlineplus/ency/article/001401.htm.

(R. 107).  Since 1989, Plaintiff had an annual examination by Dr. Shin, who renewed

Plaintiff's prescriptions for Dilantin (anti-epileptic drug prescribed to control grand mal

seizures), Depakote (for seizure disorders), and folic acid (a B vitamin).  (*Id*.)  Dr.

Paroski had treated Plaintiff every four months from July 12, 1986 until some time in

1988, prescribing phenobarbital (anticonvulsant) and dilantin.  (*Id*.)  Dr. Reed examined

Plaintiff once a year for his seizure disorder.  (*Id*.).  Plaintiff reported he was able to

walk, dress and bathe himself, (R. 109), perform household maintenance, watch

television, read books, occasionally visit with friends and drove "sometimes."  (R. 109-

10).  Plaintiff had not attended any school, received any vocation training or worked

since 1989.  (R. 110-11).  Plaintiff currently receives room and board from his mother,

residing in the basement area of her home.  (R. 376, 385, 396).

On May 25, 2003, also in connection with the SSA's periodic routine review of

Plaintiff's disability case, Plaintiff completed a Daily Activities Questionnaire.  (R. 116-

27).  Plaintiff reported that he tried "not to over do it" because of stress and his

medication, which made Plaintiff "drowsy."  (R. 117).  Plaintiff mostly stayed at home,

reading and writing and occasionally visiting friends.  (R. 117).  Upon awakening each

day, Plaintiff made his bed, washed, shaved, dressed, fixed breakfast, and took his

medication.  (R. 118).  Plaintiff was not responsible for taking care of any relatives or

pets, and no one assisted Plaintiff with his activities of daily living. (R. 118).  Activities in

which Plaintiff engaged prior to his disability, which Plaintiff could no longer do, included

swimming, running, climbing ladders, and painting, roofing and siding houses.  (R. 118).

According to Plaintiff, as long as his seizures were controlled with his medication, he

could shower and bathe, but otherwise might drown while taking a bath.  (R. 118).

Plaintiff needed to be reminded to take his medications "once in a while." (R. 119). Although at one time Plaintiff was unable to prepare meals because he feared having a seizure, Plaintiff was now able to prepare meals. (R. 119). Plaintiff listed his usual modes of transportation as walking and using public transportation, although Plaintiff did possess a driver's license, stating he drove "once [in a] while." (R. 120). Plaintiff reported being able to grocery shop, pay bills, and count change, and described his interests and hobbies as reading, watching television, occasionally playing pool. (R. 121). Plaintiff explained that compared to the CPD, when Plaintiff was not allowed to drive, Plaintiff now has a driver's license and watches more television, (R. 121), and although Plaintiff does not have any difficulties getting along with other, Plaintiff does not socialize as much as in the past. (R. 122). Plaintiff also reported no problems paying attention, finishing what he starts, following spoken or written instructions, getting along with people in authority, or remembering things. (R. 123-24).

On July 13, 2003, state agency review psychologist Madan Mohan, Ph.D. ("Dr. Mohan"), completed a Psychiatric Review Technique regarding Plaintiff's impairment, (R. 215-28), reporting Plaintiff's "low range IQ (79, 88, 81)," (R. 216), and assessing Plaintiff with mild functional limitations with regard to performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace, but no episodes of decompensation were noted. (R. 225). Dr. Mohan noted that as of the CPD, Plaintiff "manifested low range IQ, seizure disorder and mild to moderate organicity." (R. 227). Because Plaintiff had been seizure free, "a significant medical improvement has occurred." (R. 227).

By Supplemental Security Income Notice ("SSI Notice") dated July 18, 2003,

Plaintiff was advised of the SSA's determination that Plaintiff was, as of July 2003, no longer disabled, and that Plaintiff's last disability benefits check would be for September 2003. (R. 33-36). According to the SSI Notice, Plaintiff was originally found disabled on November 3, 1989, because of a mental disorder and seizures, but because it had been more than a year since Plaintiff's last seizure, and based on Plaintiff's description of his ability to care for his needs, Plaintiff's condition had improved and Plaintiff was "able to perform a job in which the work situation would not make your condition worse." (R. 36). Further, although Plaintiff has not recently worked, Plaintiff was deemed to possess the capacity to perform work "requiring only a small amount of training." (R. 36).

On May 24, 2004, Plaintiff underwent an Adult Organicity Evaluation performed by the Commissioner's consultant psychologist Thomas Ryan, Ph.D. ("Dr. Ryan"). (R. 283-86). According to Dr. Ryan, Plaintiff reported he was in regular education placement, received a high school diploma, and completed two years of college, but did not receive a college degree, and had not worked since the mid 1970s. (R. 283). Plaintiff also reported sustaining a head injury in the 1970s, and that his seizure disorder began about one year later. (R. 283). Plaintiff's current medications included Depakote, Dilantin and folic acid. (R. 283).

Dr. Ryan's May 24, 2004 behavioral observation of Plaintiff included that Plaintiff's "[s]peech and language skills reflect a great deal of stammering." (R. 284). Although Plaintiff recalled and understood instructions, "[i]t was noted that he often repeated instructions to himself." (R. 284). IQ testing yielded Verbal IQ of 76, Performance IQ of 79, and Full Scale IQ of 76, placing Plaintiff's "intellectual functioning

in the borderline range.  On the Wide Range Achievement Test in reading, word recognition skills were at 8th grade level.  This is generally consistent with [Plaintiff's] overall functioning."  (R. 284-85).  Dr. Ryan further found Plaintiff was "fairly consistent on the various subtests," demonstrating "moderate limitations in most areas."  (R. 285).  According to Dr. Ryan, Plaintiff "has difficulty in verbal tasks including vocabulary, comprehension, and similarities.  Fund of general knowledge is limited.  His arithmetic skills include the ability to do simple calculations, but not more complex ones."  (R. 285).  Plaintiff also "has difficulty in perceptual motor tasks such as block design, matrix reasoning, and picture arrangement.  He had difficulty identifying missing details among pictured objects.  On a clerical type task requiring speed accuracy, he was at the lower end of average range."  (R. 285).  On the Bender Visual-Motor Gestalt test administered to ascertain a gross estimate of Plaintiff's ability to integrate perceptual and motor functions, although Plaintiff evidenced distortions of angulation, overlap and closure, Plaintiff's performance "suggests no significant deficit within the domain of perceptual motor integrative functioning."  (R. 285).  Dr. Ryan diagnosed Plaintiff with borderline intellectual functioning and a seizure disorder, assessing Plaintiff's prognosis as "guarded, given the condition is lifelong."  (R. 286).

An electroencephalography ("EEG") taken on July 6, 2004 revealed a mild intermittent focal cerebral dysrhythmia over the right frontal temporal region, which was enhanced during a very light sleep.  (R. 295).  No definite epileptiform discharges were seen, but a few sharp transients and "breach rhythm" over the right frontal area were observed.  (R. 295).  The July 6, 2004 EEG showed significant improvement when compared to an EEG taken on March 18, 1996.  (R. 295).

A September 21, 2004 epilepsy clinic treatment note states that Plaintiff's prescription for Dilantin was discontinued on September 1, 2004, and Plaintiff's seizure disorder was controlled with only Depakote.  (R. 351).

On March 25, 2005, Plaintiff suffered a "breakthrough seizure"[5] of ten minutes duration, during which Plaintiff was unable to move his left side.  (R. 303-19).  Plaintiff was taken by ambulance to Erie County Medical Center ("ECMC"), and experienced a second seizure in the ambulance, and a third seizure in the emergency room, lasting two minutes.  (R. 303).  Plaintiff's recent use of cocaine was considered the likely cause of the seizures.  (R. 310).  A CT scan taken of Plaintiff's head on March 25, 2007, revealed status post craniotomy on the right with associated encephalomalacia (softening of brain tissue following craniocerebral trauma or other injury), no acute bleed, mass or other abnormality was noted for the age group, and some mild age-related diffuse atrophy.  (R. 309, 317).  Plaintiff was given Dilantin and did not again seize.  (R. 304).  Plaintiff was prescribed Depakote and upon release from ECMC on March 27, 2005, was permitted to resume normal activities, but was instructed not to drive until cleared by Dr. Shin.  (R. 304).

On March 30, 2005, Plaintiff was examined by Dr. Reed's Physician's Assistant Michelle Bielinski ("P.A. Bielinski"), who noted Plaintiff reported was "doing well" since being discharged from ECMC, but "sometimes feels slightly woozy," and that prior to the

---

[5] "Breakthrough seizures" are defined as "[s]udden unexpected seizures in someone who previously had achieved reliable control [and] may result from forgetting the medication, taking less than prescribed over a period of time (producing a slowly falling blood level that permits a seizure once it reaches a subtherapeutic range); withdrawal from excessive use of alcohol; or illness."  Breakthrough Seizures, *available at* http://www.epilepsyfoundation.org/about/treatment/ medications/breakthrough.cfm.

March 25, 2005 seizures, Plaintiff had missed some Depakote doses. (R. 347). Upon examination by Dr. Reed on August 11, 2005, Plaintiff reported he remained seizure free since March 2005. (R. 345).

On November 1, 2005, Plaintiff, represented by Mr. Block, participated in an administrative hearing before the ALJ. (R. 373-414). Plaintiff, then 54 years of age, testified that he was single, and lived in his own apartment in the basement of his mother's house. (R. 376, 387, 396). Although Plaintiff had attended two years of college, he did not have any college degree, and had not worked nor received any vocational training in the previous 15 years. (R. 377-78). The ALJ stated that he would not consider a medical assistant certificate Plaintiff received, prior to 1990, upon completing an 18-month program. (R. 377).

Plaintiff testified he was able to read and write, write a check, do simple arithmetic, count change, and follow simple instructions. (R. 378-79, 382). Plaintiff explained that he gave a "lump sum" of money from his monthly disability benefits to his mother who paid the bills for Plaintiff. (R. 385, 407-08). Plaintiff's activities of daily living included cleaning, cooking, washing dishes, laundry, making beds, vacuuming, sweeping, mopping, taking out trash, yard work, cutting the grass, gardening, playing chess with himself, shopping, visiting with friends, and driving once in a while, although Plaintiff had not driven since his March 2005 seizure. (R. 387-89, 408-09). Plaintiff's mother helped him cook and garden and accompanied Plaintiff grocery shopping. (R. 398-401). Plaintiff was able to bathe and dress himself. (R. 389). Plaintiff spent much of his days watching television. (R. 402-03).

Plaintiff stated his last seizure was in March 2005. (R. 379-82). According to

Plaintiff, after taking his seizure medication each morning, Plaintiff would fall asleep. (R. 386). Plaintiff testified that his most recent psychological evaluation was in May 2004, and the ALJ advised he would order another evaluation and would keep Plaintiff's case open until the results of the new psychological evaluation were received. (R. 410). No vocational expert was called to present testimony regarding Plaintiff's ability to work.

On November 18, 2005, Plaintiff underwent a psychiatric evaluation by consultant psychologist Renee Baskin, Ph.D. ("Dr. Baskin"). (R. 362-68). Dr. Baskin noted Plaintiff's academic history as a high school graduate who attended regular classes, and completion of two years of college, and seizure disorder diagnosed in the 1970s. (R. 362). Plaintiff attributed the seizure disorder to a head injury sustained in the 1970s. (R. 362-63). Dr. Baskin's examination of Plaintiff's mental status was generally normal, except for thought processes that was "somewhat tangential and almost obsessed with detailing the events" during which Plaintiff sustained the head injury that precipitated his seizure disorder, (R. 363), with intellectual functioning estimated in the borderline range, general fund of information appropriate to experience, and minimal socialization. (R. 364). With regard to Plaintiff's vocational functional capacities, Dr. Baskin assessed Plaintiff "would be able to follow and understand simple directions and instructions, perform simple tasks with supervision, maintain attention and concentration, learn new tasks, perform complex tasks with supervision, make appropriate decisions, relate adequately with others, and appropriated deal with stress." (R. 364). Dr. Baskin continued that because of the seizure disorder, Plaintiff may have difficulty maintaining a regular schedule, that "inexperience in a competitive workplace" might make it difficult for Plaintiff "to make appropriate decisions, relate adequately with

12

others, and appropriately deal with stress," and that Plaintiff had a "relatively solitary lifestyle that would suggest some difficulty with social skills." (R. 364). Dr. Baskin's diagnosis was borderline intellectual functioning, "per history," seizure disorder and complaints of back pain, and Plaintiff's prognosis was "guarded." (R. 365).

On February 14, 2006, the ALJ issued his decision, finding that "[m]edical improvement related to the ability to work has occurred" such that Plaintiff's disability ceased on July 1, 2003, and Plaintiff is no longer disabled within the meaning of the Act. (R. 26). In making the determination, the ALJ found that although Plaintiff has medically determinable impairments of borderline intellectual functioning and a seizure disorder, Plaintiff, based on his age and education beyond high school, retained the residual functional capacity to perform a broad range of work. (R. 26).

## DISCUSSION

### 1.      Standard and Scope of Judicial Review

Federal district courts have jurisdiction under 42 U.S.C. § 405(g) ("§ 405(g)"), to hear claims based on the denial of disability benefits, *Matthews v. Eldridge*, 424 U.S. 319, 320 (1976), including SSI benefits. 42 U.S.C. § 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."). A court reviewing a decision of the Commissioner may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause

for a rehearing."  42 U.S.C. § 405(g).  Further, the court may set aside the Commissioner's determination only if it is "based on legal error or is not supported by substantial evidence."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).

"Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  As such, § 405(g) limits the court's scope of review to two inquiries, including "whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  *Green-Younger v. Barnhard*, 335 F.3d 99, 105-06 (2d Cir. 2006) (quoting *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (additional internal quotation omitted)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and the reviewing court does not decide the case *de novo*.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and…educational background, age and work experience."  *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  Further,  "[i]n assessing the disability, the Commissioner must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Monguer v. Heckler*, 722 F.2d

1033, 1037 (2d Cir. 1983) (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). *See also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) (" The Social Security Act is a remedial statute, to be broadly construed and liberally applied.") (internal quotation omitted). As such, "a claimant need not be an invalid" to qualify as disabled under the Act. *Williams*, 859 F.2d at 260.

The Act defines a disability as the "inability to engage in substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 1382c(a)(3)(A) (pertaining to SSI program). An individual, however, will only be considered "under a disability" if his impairment is so severe that he is both unable to perform previous work and unable, based on his age, education, and work experience, to engage in any other substantial gainful work existing in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

**2.      Standard for Termination of Disability Benefits**

One a claimant's disability has been established under the Act, before disability benefits may be discontinued, medical improvement allowing an individual to perform work at the substantial gainful activity level must be shown. 20 C.F.R. § 416.994(b). Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that [Plaintiff] w[as] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with

[Plaintiff's] impairment(s). . . ."  20 C.F.R. § 416.994(b)(1)(i).  Medical improvement is

not related to the ability to work if there has been a decrease in the severity of the

impairments present at the time of the Commissioner's most recent favorable medical

decision, but no increase in the functional capacity to do basic work activities.  20

C.F.R. § 416.994(b)(1)(ii).  Disability benefits will continue despite medical improvement

in a claimant's impairment that is unrelated to the ability to work.  *Id.*  Further, a

determination that medical improvement related to the ability to do work has occurred

does not necessarily mean that a claimant's disability has ended unless it is also shown

the claimant is currently able to engage in substantial gainful activity.  20 C.F.R. §

416.994(b)(1)(iii).

Although the federal regulations set forth a five-step analysis that the

Commissioner must follow in determining eligibility for disability insurance benefits.  20

C.F.R. § 416.920(a)(4)(i) - (v), *see Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986);

*Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982), the Commissioner's determination

whether a claimant continues to be disabled requires a different, seven-step evaluation

process.  20 C.F.R. § 416.994(b)(5)(i) - (vii).  In particular, the Commissioner must

consider:  (1) whether the claimant has an impairment or combination of impairments

meeting or equal to the severity of an impairment listed in 20 C.F.R. Part 404, Subpt. P,

Appendix 1 ("Listing of Impairments"), and, if so, the claimant's disability will be found to

continue, 20 C.F.R. § 416.994(b)(5)(i); (2) if the claimant does not have such an

impairment, whether there has been medical improvement demonstrated by a decrease

in medical severity of the claimant's disability, 20 C.F.R. § 416.994(b)(5)(ii); (3) if there

has been medical improvement, whether such improvement is related to the claimant's

ability to work, 20 C.F.R. § 416.994(b)(5)(iii); (4) if there has been no medical improvement, of if there has been medical improvement unrelated to the claimant's ability to work, whether any of the exceptions in paragraphs (b)(3) ("first group") or (b) (4) ("second group") of this section apply.  If no exception applies, disability will be found to continue; if an exception from the first group applies, review proceeds to step five; if an exception from the second group applies, disability will be found to have ended, 20 C.F.R. § 416.994(b)(5)(iv); (5) whether the claimant's current impairments, either individually or in combination, are severe such that the claimant's residual functional capacity shows significant limitations in the ability to perform basic work activities, in which case the review proceeds to step six and, if not, disability will be found to have ended, 20 C.F.R. § 416.994(b)(5)(v); (6) whether the claimant can perform past relevant work, in which case disability will be found to have ended,  20 C.F.R. § 416.994(b)(5)(vi); and (7) if the claimant can no longer perform past relevant work, whether the claimant can, based on his residual functional capacity assessment, and considering the claimant's age, education, and part work experience, perform other work, in which case disability will be found to have ceased; otherwise, disability will be found to continue, 20 C.F.R. § 416.994(b)(5)(vii).

In the instant case, Plaintiff argues only that the ALJ's determination that Plaintiff is no longer disabled is erroneous as a matter of law because the ALJ erred at the seventh step of the analysis by considering Plaintiff as having more than a high school education based on the fact that Plaintiff graduated high school and completed two years of college, despite the fact that the record establishes that Plaintiff suffers from diminished brain functioning based on his borderline intellectual capacity, as a result of

which Plaintiff functions at an eighth grade level. Plaintiff's Memorandum at 9-12.

Alternatively, Plaintiff maintains the ALJ erred by relying solely on the Grids[6] without

obtaining a vocational expert's opinion as to the impact of Plaintiff's borderline

intellectual functioning on Plaintiff's ability to work. Plaintiff's Memorandum at 12-18. In

further support of its motion, Defendant maintains that although the record fails to

indicate precisely when Plaintiff attended college and earned his medical assistant

certificate, "it was apparently significantly later in time than his head injury (which

occurred in the 1970's [*sic*] and, presumably, after [Plaintiff] went to high school."

Defendant's Reply at 3. In support of this statement, Defendant relies on the following

exchange between Plaintiff and the ALJ at the November 1, 2005 ALJ hearing:

> ALJ: Do you have any vocational training where you received a certificate - -
>
> Plaintiff: I received - -
>
> ALJ: - - in the last 15 years?
>
> Plaintiff: - - I received a, a certificate for a medical assistant.
>
> ALJ: When was that?
>
> Plaintiff: Oh boy, I can't remember what year it was.
>
> ALJ: Was it before 1990?
>
> Plaintiff: I went, I went 18 months for it. I[t] would have been before 1990, yes.

(R. 377).

---

[6] The "Grids" refers to the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile. *Decker v. Harris*, 647 F.2d 291, 296 (2d Cir. 1981).

It simply does not logically follow that because Plaintiff testified to receiving his medical assistant certificate prior to 1990, that Plaintiff must have earned the certificate after sustaining the head injury in the mid 1970s.  In fact, although the date of Plaintiff's high school graduation is not found in the record, given Plaintiff's birth date of February 19, 1951, it is quite likely that Plaintiff graduated high school in the late 1960s or early 1970s, in which case it is more than possible that Plaintiff completed two years of college and an 18-month medical assistant certificate program prior to sustaining his head injury in the mid 1970s.[7]  It is also possible that Plaintiff was enrolled in the 18-month medical assistant certificate program either prior to or while attending college. As such, Defendant's bald assertion that Plaintiff attended college and completed the medical assistant certificate program after sustaining the head injury is mere speculation.

The record establishes that Plaintiff's initial disability determination on November 3, 1989, was based on the finding that Plaintiff suffered from both a seizure disorder and impaired brain function.  (R. 15, 57).  The impaired brain function diagnosis pertains to Plaintiff's borderline intellectual functioning which is based on Plaintiff's IQ scores, in 1988, of 79 (verbal), 88 (performance) and 81 (full scale), (R. 59, 164, 216), and which was attributed to Plaintiff's head injury.  (R. 59, 283, 303, 362, 363).  Further, a 1988 psychological evaluation showed a relative limitation on verbal and verbal sequencing capacities, resulting in an impression of mild to moderate organicity, with

---

[7] Although Plaintiff asserts he sustained the closed head injury "after completing his formal education," Plaintiff's Memorandum at 11, such assertion is not conclusively established by any evidence in the record.

behavioral evidence of "frontal lobe syndrome" in which Plaintiff "relies inordinately upon others for directions and responds to situations in a slow and bland manner." (R. 59).

Although Plaintiff's seizure disorder was well-controlled with medication, with a July 6, 2004 EEG showing significant improvement when compared to an EEG taken on March 18, 1996, (R. 295), no similar improvement has been established as to Plaintiff's impaired brain function. As such, whether Plaintiff attended college or completed the medical assistant certificate program before or after sustaining the head injury in the 1970s, is irrelevant to the fact that Plaintiff's impaired brain functioning, one of the impairments on which Plaintiff's initial disability determination was based, continued, with no evidence of any improvement, as of the ALJ's hearing on November 3, 2005. In fact, the ALJ stated that he would not consider the medical assistant certificate Plaintiff received, prior to 1990, upon completing an 18-month program as evidence of the extent of Plaintiff's education or vocational training. (R. 377).

Plaintiff argues the ALJ's consideration of Plaintiff's completion of two years of college as evidence of "more than a high school education" is not a realistic portrayal of "Plaintiff's current capacities or any vocational advantages resulting from formal schooling prior to his head trauma." Plaintiff's Memorandum at 10. In support of this argument, Plaintiff references 20 C.F.R. § 416.964(b), which provides guidance as to how to evaluate a claimant's education as a vocational factor. In particular, the regulation states in pertinent part

> The importance of your educational background may depend upon how much time has passed between the completion of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting. Formal education that you completed many years before your impairment began, or unused skills and

knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work. Therefore, the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities. . . .

20 C.F.R. § 416.964(b).

Significantly, here, substantial evidence in the record contradicts Plaintiff's numerical grade level as an accurate representation of Plaintiff's actual educational abilities.

In particular, Plaintiff's borderline intellectual functioning has been attributed to the closed head injury and resulting brain bleed sustained in the mid-1970s. (R. 59, 283, 303, 362, 363). After observing Plaintiff on May 24, 2004, Dr. Ryan reported Plaintiff's recent IQ testing yielded Verbal IQ of 76, Performance IQ of 79, and Full Scale IQ of 76, placing Plaintiff's "intellectual functioning in the borderline range," with reading and work recognition skills at the 8th grade level, consistent with Plaintiff's overall functioning as well as with "various subtests" demonstrating "moderate limitations in most areas," with limited "[f]und of general knowledge," (R. 284-85), and diagnosed Plaintiff with borderline intellectual functioning, assessing Plaintiff's prognosis as "guarded, given the condition is lifelong." (R. 286). Dr. Baskin's findings after examining Plaintiff on November 18, 2005, are consistent with Dr. Ryan's findings insofar as Dr. Baskin estimated Plaintiff's intellectual functioning in the borderline range, general fund of information appropriate to experience, and minimal socialization, with a "guarded" prognosis. (R. 364-65). In contrast, nothing in the record suggests other than that Plaintiff's suffers from a permanent borderline intellectual functioning condition rendering Plaintiff incapable of functioning at more than an 8th grade level. (*See* R. 1-

413, *passim*).

Although substantial evidence establishes Plaintiff's actual educational ability is at less than the level of a high school graduate, and it is undisputed that Plaintiff is of advanced age and has no relevant past work experience, because, according to the record, Plaintiff retains the exertional physical residual functional capacity for "very heavy work" (R. 25), a finding not challenged by Plaintiff, the ALJ relied solely on the Medical Vocational Guidelines of Appendix 2 of Subpart P of the Regulations ("the Grids"), in determining that Plaintiff is no longer disabled without obtaining testimony from a vocational expert as to the impact posed by the Plaintiff's nonexertional limitations, *i.e.*, Plaintiff's borderline intellectual functioning*, see Gallivan v. Apfel*, 88 F.Supp.2d 92, 99 (W.D.N.Y. 2000) (considering borderline intellectual functioning a nonexertional limitation), Social Security Ruling ("SSR") 85-15[8] (1985) ("Mental impairments are generally considered to be nonexertional."), as well as the side effects of Plaintiff's anticonvulsant medications, *see Merrell v. Astrue*, 2008 WL 4104553, *12 (N.D.N.Y. Aug. 29, 2008) (considering side effects from medications as nonexertional limitations), on Plaintiff's exertional capacity.[9]

---

[8] Social Security Rulings are agency rulings "published under the authority of the Commissioner of Social Security and are binding on all components of the Administration. These ruling represent precedent final opinions and orders and statements of policy and interpretations that [the SSA] ha[s] adopted." 20 C.F.R. § 402.35(b)(1).

[9] Under the Act, limitations are classified as "exertional" if they affect a claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 416.969a(a). Such exertional limitations include "limitations and restrictions imposed by . . . impairment(s) and related symptoms, such as pain, [that] affect only [the] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 416.969a(b). In contrast, "nonexertional" limitations are "limitations and restrictions imposed by . . . impairment(s) and related symptoms, such as pain, [that] affect only [the] ability to meet the demands of jobs other than the strength demands," including nervousness, inability to concentrate, difficulty understanding or remembering detailed instructions, difficulties with sight or vision, inability to tolerate dust or fumes, and difficulty performing the manipulative or postural functions of some work. . . ."

The Grids are often used to determine whether alternative employment exists in the national economy. *Decker*, 647 F.2d at 296. The Grids establish a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile. *Id*. The Grids combine several factors including education, work experience, and age to determine whether a finding of "disabled" or "not disabled" should be rendered. *Decker*, 647 F.2d at 296; *Bapp*, 802 F.2d at 604. Where a claimant who despite any exertional limitations, retains the residual functional capacity for "very heavy work," defined as the lifting objects weighing more than 100 pounds at a time, with frequent lifting or carrying of objects weighing 50 pounds or more, 20 C.F.R. § 416.967(e), or "heavy work," defined as lifting objects weighing no more than 100 pounds at a time, with frequent lifting or carrying of objects weighing up to 50 pounds, such impairment "would not *ordinarily* be the primary reason for unemployment, and *generally* is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 204.00 ("Rule 204.00") (italics added). Where, however, as in the present case, a plaintiff's nonexertional limitations further significantly limit the plaintiff's ability to work, apart from any incapacity attributed solely to exertional limitations such that the plaintiff is unable to perform the full range of employment otherwise indicated by the Grids, the ALJ is required to obtain testimony from a vocational expert as to the effect of the nonexertional limitations on Plaintiff's residual functional capacity. *Bapp*, 802 F.2d at 603 ("when a claimant's nonexertional

20 C.F.R. § 416.969a(c).

impairments significantly diminish his ability to work - over and above any incapacity caused solely from the exertional limitations - so that he is unable to perform the full range of employment indicated by the medical vocations guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

Here, with regard to Plaintiff's physical residual functional capacity, the ALJ correctly found that Plaintiff's medical records revealed no evidence of physical limitations other than a well-controlled, by daily prescription medication, seizure disorder that did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Further, Plaintiff was found to retain the residual functional capacity for "very heavy work."  (R. 25).  As such, despite Plaintiff's advance age, limited education, and lack of past relevant work experience, the ALJ relied solely on Rule 204.00 of the Grids (capacity for "very heavy work" or "heavy work" precludes disability finding) in finding Plaintiff was no longer disabled.

Because the ALJ relied solely on the Grids in determining Plaintiff was no longer disabled, the ALJ did not obtain information from a vocational expert directed to whether Plaintiff's nonexertional limitations should be found to have reduced Plaintiff's residual functional capacity below the threshold for "heavy work."  Although the ALJ's decision whether to call a vocational expert for such testimony is discretionary, not mandatory, *see Tremberger v. Apfel*, 2001 WL 699056, *5 (S.D.N.Y. 2001) (holding that ALJ did not abuse his discretion not to call vocational expert, citing SSR 83-14 (discussing that an ALJ "may" call for testimony from a vocational expert at a hearing)), the ALJ's failure to call such expert is an abuse of discretion where, as here, evidence in the record

suggests the Plaintiff is unable to work at the Rule 204.00 exertional level otherwise permitted by a lack of exertional limitations based on the nonexertional limitations of borderline intellectual functioning and the side effects of Plaintiff's anticonvulsant medications. *Bapp*, 802 F.2d at 603.

As discussed, Discussion, *supra*, at 22, the record establishes that Plaintiff suffers from borderline intellectual functioning, a nonexertional limitation. *Gallivan*, 88 F.Supp.2d at 99; SSR 85-15. Additionally, although not addressed by the ALJ, evidence in the record suggests Plaintiff suffers an additional nonexertional limitation resulting from the side effects of his anticonvulsant medications. Specifically, Plaintiff both stated in papers filed in connection with his appeal of the Commissioner's determination that his disability had ended that he remained unable to work based on his medications (R. 106, 111), and testified at the ALJ hearing that his anticonvulsant medications he took on a daily basis made him "drowsy, sleepy. I sleep a lot," (R. 386), explaining that "after I take the medication in the morning, and it, I guess it goes through my system. And I'm - - if I'm in the house sitting, <u>I'll</u> <u>end</u> <u>up</u> <u>going</u> <u>to</u> <u>sleep</u> <u>sooner</u> <u>or</u> <u>later</u> <u>somewhere</u>." (R. 386 (underlining added)). As such, the "drowsy" or "going to sleep" side effect of Plaintiff's anticonvulsant medications suggests a possible reduction in Plaintiff's exertional capacity. Although it escapes this court's understanding as to how one who is likely to fall asleep while engaged in *any* work retains any residual functional capacity for "very heavy work" or "heavy work," a vocational expert may be able to reconcile this apparent implausibility.

Significantly, if Plaintiff's nonexertional limitations limit Plaintiff's exertional capacity to "medium work" or less, the Grids, based on the vocational factors of

Plainitff's age ("advanced" or "closely approaching advanced age"),[10] education (limited), and previous work experience (none), would dictate a finding of "disabled." See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 203.10 (advanced age) and § 203.02 (closely approaching advanced age). Moreover, insofar as record does not contain sufficient information to determine the effect of the Plaintiff's borderline intellectual functioning and the side effects of Plaintiff's medication on Plaintiff's exertional capacity, "the ALJ, unlike a judge in a trial, must himself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding" and has a duty to develop the record. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotation omitted). "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, and exists even when, as here, the claimant is represented by counsel." *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d) - (f), and *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

Accordingly, remand is necessary for further development of the record regarding the effects of Plaintiff's borderline intellectual functioning and medication on Plaintiff's ability to perform work, at the "very heavy" and "heavy" exertional levels, to accurately determine Plaintiff's present residual functional capacity before terminating Plaintiff's benefits, including obtaining testimony from a vocational expert on this issue.

---

[10] Plaintiff's age, in the context of nonexertional limitations, is considered as both "advanced" (55 and over), 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(f), and "closely approaching advanced age" (age 50-54), 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(g), because Plaintiff was, as of July 2003, when Defendant rendered initial decision terminating his benefits, 52 years of age and is now 58 years of age.

## **CONCLUSION**

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc.

No. 8), should be DENIED, and the matter should be REMANDED for further

proceedings consistent with this Report and Recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     November <u>4</u>, 2009
               Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an**
**extension of such time waives the right to appeal the District Court's Order.**
*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:       November 4, 2009
             Buffalo, New York